## THE GAZELLE. (Two Cases.)

*(District Court, D. Maryland. April 12, 1882.)*

ADMIRALTY—CHARTER-PARTY—SAFE PORT.

Where a vessel is chartered for a voyage to a safe Norwegian or Danish port, as ordered on signing bills of lading, or as near thereunto as she can safety get, and always lay and discharge afloat, lighterage, if any, to be at the expense and risk of the cargo, *held*, that the vessel could not be ordered to Aalborg, a Danish port, into which a vessel of her towage could never get by reason of her draught of water, and where she would have to discharge the whole of her cargo into lighters two miles out in the open water of the Kattegat, at a distance of over 17 miles from the port, and at an anchorage proved not to be reasonably safe for that purpose.

*Held*, that the fact being that the vessel could not get into the port, and that there was no anchorage near and customarily used in connection with it, where she could safely lay and discharge, it was the duty of the master to refuse to sign bills of lading purporting that he was going to deliver the cargo there, even with the clause inserted, "as near thereunto as the vessel can safely get, and always lay and discharge afloat."

In Admiralty. Cross-libels.

*A. Stirling, Jr.*, for owners of the ship. *S. T. Wallis* and *H. C. Kennard*, for owners of cargo.

MORRIS, D. J. On June 16, 1881, the Norwegian bark Gazelle, 571 tons, being then in the port of Baltimore, was chartered by her master, under the usual grain and petroleum charter used in the Atlantic ports of the United States, to Messrs. Meisner, Ackerman & Co., of New York, for a voyage from the port of Baltimore to "a safe, direct Norwegian or Danish port, as ordered on signing bills of lading, or as near thereunto as she can safely get, and always lay and discharge afloat." The charterers agreed to furnish a full cargo of refined petroleum in customary barrels, and to pay freight at the rate of three shillings three pence per barrel. The lay days in Baltimore were to expire July 6th, and for discharging at port of discharge customary dispatch. Demurrage to be at the rate of 11 pounds sterling per day. The cargo to be received and delivered along-side the vessel within reach of her tackles. Lighterage, if any, always to be at the risk and expense of the cargo. The cargo, consisting of 3,131 barrels of refined petroleum, was put on board by the charterers, and on July 6th they tendered to the master of the Gazelle bills of lading, ordering the vessel to the port of Aalborg, on the eastern coast of Denmark. The master refused to sign the bills of lading, except with protest as to the port noted on them, upon the ground that Aalborg was a port into which, on account of shallow water on the bar, no

vessel of the tonnage of the Gazelle could enter, even in ballast, and because, as he alleged, there was no anchorage near the port where he could, with safety, lay at anchor and discharge. He did say, after some discussion, that he would sign bills of lading containing the words "or as near thereunto as the vessel can safely get, and always lay and discharge afloat;" but subsequently, upon the charterers assenting to this clause being inserted in the bills of lading, he refused, saying, in effect, that as he knew the fact to be that there was no place near Aalborg where his vessel could safely lay and discharge, and as he knew beforehand that he would have to go to the nearest safe port, he would not sign any bills of lading which might, in any way, commit him to anything else. Neither party being willing to yield, the master libelled the cargo for demurrage and damages, and the charterers have libelled the ship for breach of the charter-party.

The charterers contend, firstly, that by the literal meaning of the language of the charter-party, as well as by the meaning which established usage and custom has uniformly given to it, the ship may, under it, be ordered to any safe commercial port within the range described in the charter-party, whether she can get into it or not, provided there is an anchorage near the port customarily used in connection with it, and where it is reasonably safe for the ship to lay and discharge; and they claim that there is such an anchorage used in connection with the port of Aalborg, in the Kattegat, off the bar at the entrance of the Limfiord. In the second place, they claim also that in Baltimore, New York, and other Atlantic ports of the United States, by the established usage and custom of the trade with respect to similarly-worded charters, the contract is understood to be that if the port to which the ship is ordered is a port within the range described in the charter, and one where foreign commerce is carried on, the master, upon being ordered, is obliged to sign the bills of lading and sail for it; that if the master had intended to refuse to go to that port, the custom and usage require that he should have excluded and excepted it from the range of ports described in the charter, and, not having excepted it, he is obliged to sign the bills of lading and sail for it; that if, arriving off the port, he cannot enter it by reason of a permanent obstacle, and finds that he cannot safely lay at the customary anchorage and discharge, then he may make protest and go to the nearest port at which he can safely discharge.

As to this latter custom which the charterers have attempted to set up, I do not find that the proof adduced established a general acquiescence in respect to it. It is only quite recently that the ques-

tions have arisen which would give rise to its operation; and while it is shown that shippers and charterers have insisted in controversies with ship-masters that such was the contract and custom, and that ship-masters have generally, with some grumbling and hesitation, yielded and signed the bills of lading and set sail for the port objected to, it has not been shown that in any such case the port or anchorage objected to was in fact unsafe, nor that there was any general acquiescence by the owners or masters of ships in such a usage, or that they have accepted such a construction of the charter.

Moreover, I do not think that such a usage, if proved, and if admissible under this charter and otherwise unobjectionable, could be sustained as reasonable. If it were the fact that the ship could not, even in ballast, enter the port and remain there always afloat, and that there was no anchorage near the port where she could safely lay and discharge, and these facts were known to the master, and he was aware that he would from necessity have to go to another port to discharge, a custom which would compel him to sign bills of lading professing that he intended to deliver the cargo at such impossible port, "or as near thereunto as he could safely get," etc., and then make a pretence of an effort to go there, might very well suit the merchant who had purchased the cargo and chartered the ship on a foreign order, and was only interested to get the ship cleared and clean bills of lading into his hands, but it would be compelling the master to do a senseless act, calculated to mislead every one dealing with the bills of lading, and likely to give rise to expense, loss, and litigation.

I think there could be no such lawful custom. On the contrary, if the facts in any case be as above stated, and the master knows the facts, then I take it to be his plain duty to refuse to sign the bills of lading unless he chooses to do so with protest as to the port noted on them. It is the peculiar business and duty of the ship-master to know what ports his vessel can enter, and what anchorages are safe, and signing the bills of lading without objection might result in committing him to the acceptance of the port as safe. *The Maggie Moore*, 8 Fed. Rep. 620; *Capper* v. *Wallace*, 5 Q. B. D. 166.

I come, then, to the first ground on which the charterers put their case, viz., that the language of the charter, "*to a safe Danish port, or as near thereunto as she can safely get, and always lay and discharge afloat*," and the obligation which, in all the Atlantic ports, it is uniformly understood and conceded arises from the use of that language in such a charter, requires that the vessel shall go to any safe commercial port, within the range described in the charter, provided there

is customarily used in connection with the port a safe anchorage, where she can safely lay and discharge, even if, on account of her draught of water, she can never get into the port itself. To prove this custom, many experienced shipping merchants and ship-owners and brokers of New York and Baltimore were called as witnesses, and they testified that such is the well-understood signification uniformly given to this form of charter by all who use it. If the view I take of the facts of this case made it necessary for me to pass upon this point, I do not see how I could ignore a construction of a peculiar commercial contract, in daily use in important transactions, which is shown to be acquiesced in and acted upon by all those who use it. *Gracie* v. *Ins. Co.* 8 Cranch, 83; *Renner* v. *Bank of Columbia,* 9 Wheat. 588. This construction does not, to my mind, conflict with or do violence to the language of the contract, and I cannot see that any one of its terms would become inconsistent if the full signification claimed to be given to it by the custom were written out in the contract itself.

I am aware that in the court of appeal of England, in the case of *The Alhambra,* L. R. 6 P. D. 68, in a controversy arising under a similar charter, that learned court refused to so interpret this language; but the custom here proved was not set up in that case, and there was no attempt to show the signification in which the terms of these charters are received and acted upon by those persons who are in the daily practice of signing them. The custom relied upon in that case was a custom of the port to which the ship was ordered, and the court held that a local custom of a port to which the ship might chance to be ordered was not admissible to construe the charter-party. I cannot but think that if the custom here set up had been proved in that case it would have been admitted.

But the claimants of the ship contend in this case that even if it be granted that the charter-party has the meaning which under the custom is claimed for it, still the master was justified in refusing to go to Aalborg or to sign bills of lading agreeing to deliver the cargo there.

The port and town of Aalborg is situated in Jutland, on the south bank of the Limfiord, about 17 miles from its mouth at the Kattegat. The waters of the Limfiord are deep, but at its mouth there is a bar some 2,000 feet wide, on which there is ordinarily not over 10 feet of water, and not usually more than 11 feet at the spring tides. Consequently, although from time immemorial there has been a considerable commerce carried on with the port, only vessels of very

small draught can get up to it. Off the mouth of the Limfiord, outside the bar, there is no sheltered bay nor any indentation in the coast, but the coast line is a nearly straight north and south line. Vessels of the size of the Gazelle, which undertake to discharge their cargoes there, do so anchored out in the Kattegat, about two miles from the bar, in water about six fathoms deep. There they find a sandy bottom, affording fairly good holding ground, and a growth of sea-weed which is said to have a tendency to keep the water smooth. The vessels which do business with the port are usually of small draught, able to cross the bar when loaded, and there are some steamers of larger tonnage which trade regularly between Aalborg and English ports. These latter have lighters which they take in tow going out, receiving from them part of their cargo when over the bar, and in returning discharge into them sufficiently to lighten to 10 feet, and then tow the lighters in with them. Since 1876 there have been cargoes of grain and petroleum exported from the United States to Aalborg—as far as known, some 31 cargoes in all. Many of these were in vessels of such size as to be able to get in over the bar after lightering a reasonable amount, and some two or three of larger size discharged their whole cargo outside, without accident or damage.

There were called as witnesses on behalf of the Gazelle a number of Norwegian ship-masters familiar with the navigation of the Kattegat, and they testify that it is well known to be a stormy, dangerous sea, liable at all seasons of the year to sudden and violent winds from all quarters; that it is difficult for vessels to escape from storms there because of the shoals and intricacies of the channels, the constant danger of being driven ashore, and the lack of harbors of refuge, so that masters, when they can, often prefer to run out into the open ocean to escape a storm rather than risk encountering it in the Kattegat. They state that a vessel lying at anchor off the mouth of the Limfiord would not be sheltered from any winds except from the west or land side, and in case of a wind springing up from any other quarter sufficiently strong to cause the ship to part her cables or drag her anchors, she could not make her escape and would have to go ashore; that no mariner in the Kattegat seeking shelter would ever think of anchoring off the Limfiord as a place of safety; that there are not to be found at the place any of the elements which constitute a safe anchorage, except the one fact that the water deepens very gradually out from the bar, and the proper depth for anchoring can be found with a bottom affording moderately good holding; and,

further, they show that there is no port of refuge where such a vessel could get protection nearer than Frederickshaven, distant about 25 miles to the north, or Arhus, distant over 50 miles to the south.

Without doubt, in the summer months, and about the time when the Gazelle might have been expected to have completed her voyage, storms are less frequent and less violent, and some few vessels of her size are shown to have discharged their cargoes at that season without accident. The masters of two vessels which have done so were examined. One of them says that he went there, having signed the bill of lading under protest, and only consented to discharge at anchor off the Limfiord upon obtaining an agreement with the consignee for additional compensation. He testifies that with the most favorable weather and during the very best part of the summer, working often at night and on Sundays, he was three weeks discharging a cargo of petroleum. He asserts the anchorage to be unsafe at all seasons of the year, and thinks a vessel would run less risk anchored in the middle of the Kattegat, where she would have more room to maneuver in case she had to seek refuge.

It is shown by these witnesses that the discharging of the cargo is necessarily slow, and liable to interruptions. The so-called lighters are small sea-going sail-vessels which ply between the ship and the port, which is upwards of 17 miles distant up the Limfiord, and if the water is rough they cannot lie along-side the ship. If any accident happens to the ship there is no port nearer than Arhus or Frederickshaven where she could be repaired, and the ballast which she needs before she can proceed to sea after discharging her cargo must also be lightered out to her as the cargo is taken away.

The consideration suggested by this testimony, and the weight of the opinions of master mariners who have had full opportunities of knowing the facts and forming sensible judgment, have convinced me of what I think any one, without the assistance of experts, would be inclined to suppose, viz., that an open anchorage two miles off from a straight coast in a stormy northern sea, with no sheltered port or roadstead near, to which in case of threatened danger a ship could resort for refuge, could not be an anchorage where a vessel could safely lay and discharge her whole cargo, within the meaning of this charter-party.

In claiming that the master should have excepted and excluded Aalborg before he signed the charter-party, if he did not consider the anchorage a reasonably safe one, the charterers have not the benefit of whatever force there might, in a proper case, be claimed for

that position, if there had been a long-continued and generally-known practice of large vessels making Atlantic voyages to use this anchorage, and it had been shown to have become a well-known roadstead, used in connection with a well-known commercial port, to which a vessel under such a charter might reasonably expect to be ordered.

The master of the Gazelle, who, since he has been in command of that vessel, has made seventeen voyages from Baltimore and three from New York to British and continental ports with grain, and who is a Norwegian and familiar with Danish ports, swears that he had never known of Aalborg as a port to which a vessel of the size of the Gazelle could be ordered under such a charter, and that it never occurred to him that he could be ordered there.

No doubt there are commercial ports and roadsteads to which there are objections as places of safety, but which, having been more or less improved by artificial protections, and having, from the force of circumstances, become places of large commerce, have come to be well known as ports to which large vessels in great numbers do go. As to such a port or roadstead, it might, in a proper case, be said that long usage, the course of commerce, and the continued acquiescence of ship-owners, had estopped them from now saying that such an objectionable port or roadstead is not safe, and under such circumstances it might well be said that if the shipowner did not intend his vessel to go there, the charterers might require to be warned of it by a special exception in the charter-party.

It is plain, I think, that Aalborg and the anchorage off the Limfiord does not come within that class.

Before the great increase in the exportation of grain and petroleum, the ports to which vessels were sent from the United States were not great in numbers and were well known; but increasing trade and facilities for internal transportation have opened many new ports in all parts of the world, to which vessels are now sent more or less frequently. Aalborg is one of the ports to which this commerce is new. It was commenced in 1876, and since then, in five years only, some 31 ships are known to have gone there from the United States. Of these some were under charters in which that port was specially named and agreed to, and a special rate of freight paid, and almost all were vessels of such size that a reasonable amount of lightering enabled them to get over the bar and up to the port.

It has been also urged on behalf of the charterers that the master of the Gazelle having, after this controversy had arisen, proposed to

the agents of the charterers to sign the bills of lading, provided the words "or as near thereunto as she can safely get, and always lay and discharge afloat," were interlined, and their agents, after only sufficient delay to communicate with the charterers; having agreed to accept the bills of lading so amended, that this was a compromise, and constituted a new agreement from which the master could not recede. But to my mind this was not a compromise. The bills of lading, before the proposed amendment, expressed that they were subject to all the conditions of the charter-party, and the interlineation was merely putting there a portion of the very language of the charter. Nothing was done, in consequence of the proposition of the master, which in the slightest way altered the position of either party. The master seems to have been persuaded that the interlineation would be sufficient to call attention to the fact that he objected to the port, and could not go there, but subsequently he concluded that as he knew he could not safely undertake to deliver the cargo at the port, nor near it, he ought not to sign a bill of lading purporting that he was going to attempt it. In this I think he was right.

In my judgment the libel filed by the charterers must be dismissed, and there must be a decree in favor of the owners of the ship.