## Case No. 12,720.
### SHAW v. HART.
### [1 Spr. 567.] [1]

District Court, D. Massachusetts. July, 1859.

CHARTER PARTY—GUARANTY OF DEPTH OF WATER —FULL FREIGHT—LOSS OF RAFT.

1. Where, by a charter-party made in Boston, a vessel was to go up a river in North Carolina, and take a cargo of lumber and convey it to Boston, for $1000, with a guaranty that there should be eight feet of water at the place of loading, which would enable the vessel to take on board a full cargo: and the water there was of that depth, but the cargo could not be conveyed to the sea, because the water below was only seven feet deep: *Held,* that, by the guaranty, the carrier was entitled to eight feet of water, not only at the place of loading, but in the river below, if that depth was necessary.

2. If the master took on board all that the vessel could carry down the river, and was prevented from taking more, by the default of the

[1] [Reported by F. E. Parker, Esq., assisted by Charles Francis Adams, Jr., Esq., and here reprinted by permission.]

charterer in not keeping his guaranty, he was entitled to recover the $1000, notwithstanding less than a full cargo was transported and delivered.

3. The master attempted, for the benefit of the charterer, and by his assent, through an agent, to tow a raft down the river to a place where it might be taken on board. to make up a full cargo, and, on the way, the raft was broken and lost by the violence of the waves, *held,* that neither the master. nor his owners, were responsible therefor.

This was a libel for freight upon a charter-party. In December, 1858, the libellant chartered the schooner B. F. Reeves, of which he was master, to the respondent, for a voyage from North river, North Carolina, to Wood's Hole and Boston, with a cargo of ten hundred and thirteen cedar spars, for buoys, to be landed in part at Wood's Hole, and the remainder in Boston, for the round sum of $1000, to be paid at said Wood's Hole and Boston, in proportion to the amount of cargo to be landed at these places respectively. The vessel was lying at Boston. when the charter was made. It was stipulated, on the part of the respondent, that the cargo should be delivered and received within reach of the vessel's tackles, and that there should be eight feet of water at the place of loading. It was also provided in the charter that, on arrival at "Thoroughface Island," the libellant should report himself to Heman Hinds. To reach Thoroughface Island, it was necessary to pass Hatteras Inlet, and thence to proceed about seventy miles, through a sound, to the mouth of the North river, thence, across a bar and up the river, about twenty-four miles. At Hatteras Inlet, and over the bar, and in fact for most of the distance up the river, the water did not exceed seven feet in depth. On arriving at Thoroughface Island, the master reported himself to said Hinds, who thereupon proceeded to deliver to him the cargo. The vessel, while receiving her cargo, lay at a place in the river, near Thoroughface Island, called "The Gap," where the water was about twenty feet deep. When the vessel had taken in about two-thirds of the spars, she was loaded to the depth of seven feet, and both the master and Hinds agreed that it would be useless to take in more, as, in the ordinary state of the water, the vessel could not get down the river, or over the bar or through Hatteras Inlet, drawing more than seven feet of water. The remainder of the logs were then made into a raft, to be taken in tow, and to be taken on deck after the vessel should have passed the inlet. The master signed bills of lading in the usual form, excepting that they stated the fact that seventy-nine spars were in a raft, to be taken on board at Hatteras Inlet. Hinds took one part of the bill of lading, and forwarded it to Hart, to enable him to procure insurance. The vessel, with the raft in tow, passed safely down the river, but in crossing the bar, and after getting into the sound, she encountered "a short chopping sea." the raft was broken up, and all but about ten of the raft-

ed spars were lost, before reaching Hatteras Inlet. The residue of the spars were delivered to the respondent, at the places stated in the charter. It appeared that Hinds had been hired by the respondent, to superintend the cutting and getting out of the spars, and that he was to share the profits, if there should be any, from their sale, but was not to be subject to any loss. There was no other person, at the place, authorized to act for the respondent in shipping the spars. The libellant claimed that the guaranty of eight feet of water at the place of loading, must be construed as a guaranty of that depth both at the place of loading, and thence to the sea; that his failure to take on board the whole cargo, and carry it to its destination, was caused by the failure of the respondent in the performance of this guaranty; that he might well have proceeded on this voyage, when he had taken on board as many spars as he could safely carry over the bar, and upon their due delivery would have earned full freight; that the raft had been made at the request and under the direction of Hinds, who, it was insisted, was the agent of the respondent, in the hope of saving him from loss, and that he ought not to be put in a worse condition, for making this attempt, than he would otherwise have been. The respondent denied that Hinds was his agent for any purpose, but to deliver the cargo to the master, or that Hinds had advised or superintended the making of the raft, or that it was properly made. He contended that the guaranty, as to the depth of water at the place of loading, was performed, and that the master was bound either to use lighters to bring the cargo down, or to wait for a strong north-east wind, during the prevalence of which there would be eight feet of water over the bar. That the contract was entire, and the libellant having failed fully to perform it by bringing all the spars, was not entitled to any part of the freight; or, if he was entitled to any part, it was only in proportion to the cargo delivered, from which must be deducted the value of the spars lost. The evidence as to the extent of Hinds' agency, as to who advised and superintended the making of the raft, and whether or not it was properly made, was very conflicting.

John C. Dodge, for libellant.
F. C. Loring, for respondent.

SPRAGUE, District Judge. The respondent insists that the contract was entire, and that no part of the freight is earned, unless there was a full performance. This cannot be maintained, if full performance was prevented by the default of the respondent himself. This brings us to the inquiry, whether the respondent has performed his guaranty, as to the depth of water, according to its true intent and purpose.

It appears that this small river, in North Carolina, was little known in commerce, being rarely resorted to; that the libellant had never been there, and took this guaranty, because of his ignorance of the depth of water. He knew that he was to go some distance up the river, to a place of loading, and stipulated that there should be eight feet of water at that place, which would have enabled him to take on board a full cargo. I cannot doubt that he believed that, if the water was sufficient for that purpose, at the point farthest up the river, it would be deep enough below, and the respondent must have believed that his guaranty was so understood; for why should the master have required a guaranty that there should be sufficient water to take his cargo on board, if, when on board, it could not reach the sea, but must be in part, at least, unladen, and put into lighters or rafts, conveyed a considerable distance, and then reladen. It is true, that the guaranty was kept according to the letter; there were eight feet of water at the place of loading, and even more, for there seems to have been a hole just at that place, twenty feet in depth, while below, the water was not more than seven feet deep. But the guaranty was not kept according to its real intent and object. The master, then, was not bound to do more than to take on board, at the place of loading, as much of the timber as could be conveyed to the sea; and if he had done so, and delivered it to the respondent, at Wood's Hole, and Boston, he would have been entitled to his whole freight. But he consented, for the benefit of the respondent, to do more, and attempted to tow the raft down the river, for the purpose of taking it on board at Hatteras Inlet, and it was lost, by the violence of the winds and waves, in the attempt.

I do not think that either he or his owners are responsible for this loss. Hinds was the sole agent of the respondent; the extent of his agency is, indeed, in controversy, but the evidence shows that he was employed to procure the timber, convey it to the river and to the vessel, for the purpose of being laden on board of her. There was no limitation of his authority, as to the place to which he was to convey the timber, for the purpose of having it taken on board of the vessel. If, therefore, when it was found that it could not be carried down the river by the vessel, Hinds had, without the aid of the master, rafted this lumber to a place where it could be taken on board, and thence transported, it would have been within the scope of his agency; and it was no less so, if he caused the master of the vessel to do it in his stead. It was done wholly for the benefit of the respondent. I am satisfied that the raft was properly made, under the superintendence of Hinds, and that the master made every reasonable exertion for its preservation.

Decree for the $1000 stipulated in the charter-party and costs.