## BACON v. ENNIS.

(District Court, E. D. Pennsylvania. June 29, 1901.)

### No. 8.

1. SHIPPING—BREACH OF CHARTER—DAMAGES RECOVERABLE.

   The owner is entitled to recover from a charterer the amount necessarily expended by the master in trimming a cargo after loading, made necessary by the fact that the ship was loaded at a place where she could not "always be afloat," as required by the charter.

2. SAME—DEAD FREIGHT.

   Under a charter which required the ship to go to the port of loading, "or as near as she can safely go," and required the charterer to load a full cargo of ore, where the ship could not load a full cargo at the berth assigned her by the charterer, because of a bar in the harbor which she could not cross, it was the duty of the charterer to complete her load outside the bar, no custom to the contrary being shown, and his failure to do so renders him liable for dead freight.

3. SAME—DEMURRAGE.

   Where a charter required the ship to receive cargo "from the charterer's shippers," and provided that lay days should not commence until she was "in every respect ready to load or discharge," such days for loading do not commence to count until she is not only ready to load, but is at the berth where the shipper's cargo is lying, where she is delayed in reaching such berth by the rules of the port, and without fault of the charterer.[1]

In Admiralty. Suit for damages for breach of charter.

Horace L. Cheyney, John F. Lewis, and Francis C. Adler, for libelant.

Alexander Simpson, Jr., and Ira J. Williams, for respondent.

J. B. McPHERSON, District Judge. If this case is to be decided in time for an appeal to the next term, the brief time at my command does not permit me to give my reasons at length. I may, however, indicate in a few words the conclusions I have reached.

There are three items in the libelant's claim: (1) A sum of $81.46, paid by the master for trimming the vessel at Bilbao, the port of loading. This item does not seem to be contested, but in any event I think it should be allowed. The respondent, who was the charterer of the ship, loaded the vessel with iron ore, and partly owing to the wet condition of the ore, and partly to the fact that the vessel had to be loaded while she was aground at low tide,—this being in violation of a clause in the charter party, providing that her cargo was to be delivered "where she can always lie afloat,"—the cargo needed to be trimmed before it could be said to be properly stowed.

[1] Demurrage, see notes to Randall v. Sprague, 21 C. C. A. 337; Hagerman v. Norton, 46 C. C. A. 4.

(2) The second claim is for dead freight, and should, I think, be allowed, on the ground that the charterer undertook to load a "full and complete cargo of ore,"—which would be, say 3,300 tons,—whereas it was impossible to put on board at the loading berth assigned by the charterer more than 2,700 tons, because of the bar in the harbor of Bilbao, which the ship could not cross with a full cargo on board. The charter party required the ship to go to Bilbao, "or as near as she can safely go," and this clause contemplates that she is to go to a point at or near the port, from which she can get away loaded. The purpose of the voyage is to carry a cargo from the port named, and to accomplish this purpose safely she must be able to get to sea. It seems to me (no custom to the contrary having been shown), that the charterer was bound to furnish her in the river with as much as she could carry over the bar, and to complete the loading outside. Both parties may be presumed to have known of the conditions of the port; but, whether the contract was made with knowledge or in ignorance of these conditions, the charterer's obligation to furnish a full cargo is express, and nothing has been shown to excuse performance. (3) The remaining claim is for dispatch money, and this, I think, should not be allowed. The ship was not ready to receive cargo "from the charterer's shippers"—this being one clause of the contract—until she was at the ore tip, where the shippers' ore was lying; and the rules of the port of Bilbao did not permit her to get to the tip until the vessel that preceded her in turn had left the berth. The clause concerning lay days—"lay days not to commence to count until 12 o'clock noon after steamer is entered at custom house, and in every respect ready to load or discharge, and in free pratique, of which the captain is to give notice in writing to shippers or consignees"—should be read in connection with the clause first quoted,—"from the charterer's shippers." The negative form of the provision concerning lay days forbids me to read it as if it were positive, for this would be to put different words, with a different meaning, into the mouths of the contracting parties. If they had intended to provide directly that the lay days should begin at 12 o'clock noon, etc., no doubt they would have said so.

A decree may be drawn in accordance with this opinion; two-thirds of the costs to be paid by the respondent, and one-third by the libelant.