TWEEDIE TRADING CO. v. NEW YORK & B. DYEWOOD CO.

(District Court, S. D. New York. November 7, 1902.)

1. SHIPPING—CONSTRUCTION OF CHARTER PARTY—DEAD FREIGHT.
    A charter party for a steamer, fixing the port of loading, and requiring the carriage of a cargo of 2,000 tons, 10 per cent., more or less, at vessel's option, which gave her an advantage by enabling her to carry an unusually large coal supply, construed, and *held* not to render the charterer liable for dead freight because of its refusal, after the vessel had loaded 1,900 tons, having also on board 400 tons of coal, and had crossed a bar some miles from the port of loading, to lighter to her 300 tons additional on her demand.

2. SAME—INABILITY TO LEAVE PORT WITH FULL CARGO—DUTY TO WAIT REASONABLE TIME.
    A chartered steamer loading at a river port during an unusual and temporary low stage of water cannot recover dead freight from the charterer because she was unable to cross a bar with the maximum cargo she was entitled to demand, and which the charterer was able and willing to furnish, where she did not wait a reasonable time before starting for the river to rise, which would probably have enabled her to take the full cargo.

In Admiralty. Action for breach of charter.

Wheeler & Cortis, for libellant.

Butler, Notman, Joline & Mynderse, for respondent.

ADAMS, District Judge. This is an action brought by the libellant to recover damages for an alleged breach of a charter party of the steamship Endsleigh, dated January 29, 1901, providing for the transportation of 2000 tons, 10% more or less at vessel's option, of Quebracho Wood from Colastine, Argentine Republic, to New York. The contract at first provided for 1500 tons, with the same option, but the quantity was afterwards increased to 2000 tons. The libellant claims a loss in dead freight on 300 tons, which it is alleged the respondent was required to furnish to complete the cargo under the contract. It appears that the vessel reached Colastine about the 15th of May, 1901, and after the loading progressed it was found that she could not take more than 1900 tons and pass over a bar a few miles below Colastine. After having called for the full cargo, which the respondent was able and willing to furnish at Colastine, she declined to receive more than the quantity loaded and having passed over the bar, she demanded that the balance of the cargo be light-

ered to her there. The respondent declined to comply with the demand and the vessel sailed with the partial load.

The contract provided, inter alia: "The cargo, or cargoes, to be received and delivered within reach of the ship's tackles, at ports of loading and discharging, *where steamer can always safely lie afloat; Lighterage if any to be at expense and risk of cargo,*" the underlined part being written at the end of a printed clause. The libellant contends that it was entitled to have the full quantity furnished, even though it became necessary to lighter a part. The respondent contends that it was under no liability to do otherwise than deliver the quantity provided for at Colastine and if any lighterage became necessary it should be at the vessel's expense.

There can be no doubt that if the contract provided for the selection of a loading port by the charterer and contained a provision which required the vessel to go to such port "or as near as she can safely go," a clause frequently included in charter parties, the respondent would have been liable for the dead freight in this case, because such a contract contemplates the ability of the vessel to leave the port when laden according to its terms, and the burden of responsibility for the absence of a sufficient draught of water would fall upon the charterer. Bacon v. Ennis (D. C.) 110 Fed. 404; Id. (C. C. A.) 114 Fed. 260. Where a loading port is not in mutual contemplation when the contract is made, a provision that the vessel shall only be required to go as near to a port selected by the charterer as safety permits naturally follows and the burden would then justly be upon the charterer to provide for any additional expense or loss consequent upon the ship being unable to depart from the selected port with the cargo provided for by the contract. Where the port is designated in the contract and there is a similar provision with respect to going near and the parties know, when making the contract, that a full cargo can not be loaded and get to sea, the rule is the same—Shield v. Wilkins, 5 Exch. 304—; and a guaranty by the charterer of a certain draught of water at the loading port is equivalent to a guaranty of such depth in leaving the port—Shaw v. Hart, 21 Fed. Cas. 1192, 1 Spr. 567—; but where the parties do not know when making the contract that a full cargo can not be carried out of the port and there is no provision that the vessel shall go as near the loading port as she safely can, the rule is not necessarily the same. The lack of common knowledge of the situation to be encountered and the omission of the provision for near approach seem to leave the matter to be determined by an ascertainment of the intention of the parties through such means as may be at command, primarily, of course, by the language of the instrument and if the intention still remains in doubt, by a resort to the circumstances surrounding the contract. The intention of the parties seemed to be so much in doubt from this instrument that, upon the first argument, I suggested to counsel that testimony be taken to show what occurred during the preliminary negotiations, with a view of obtaining some light which might tend to explain, though not vary, the written contract. Such testimony was taken and it appears that when negotiations were in progress for the additional 500 tons, information from outside parties,

familiar with the port, was obtained by the president of the libellant with respect to the water which could probably be depended upon at Colastine and he was apparently satisfied that the risk of undertaking to carry the additional quantity could be assumed by the vessel, as a substitute for the privilege of taking cargo from other places, which was provided for by the contract, without any guaranty from the charterer as to draught. The provision for lighterage remained the same as when 1500 tons were to constitute the cargo and it is clear that no difficulty would have arisen in the vessel getting safely out of the port with that quantity. The respondent urges that by the terms of the contract the lighterage clause only came into effect in case lightering was to be done in connection with the clause providing for the cargo to be received and delivered within reach of the ship's tackles at the port of discharging as well as of loading. Read in connection with the context, it is readily susceptible of the meaning that lighterage might be resorted to, at the expense of the charterer, in case a berth could not be provided where the vessel could load afloat. Such a construction seems more reasonable than one requiring the charterer to pay for lighterage at a point considerably distant from the loading port, especially in view of the margin of loading given to the vessel of 10% more or less, which entitled her to take anywhere from 1800 to 2200 tons and to regulate her supply of coal, within the limits mentioned, according to her own advantage. She had on board at Colastine some 400 tons of coal and it was advisable that she should have such a quantity to reach a cheap coaling place as compared with places in the vicinity of Colastine but it would hardly seem fair that she should be permitted to carry a heavy supply of coal for her own benefit and at the same time call upon the charterer to supply lighterage for cargo which she could not carry from the loading port, partly owing to such supply of coal. There is no provision in the contract with respect to the coal to be carried. The charter is made upon a sailing vessel form and only provides for stowage room for provisions, *sails* and cables. Of course, the steamer was entitled to carry coal but there is much persuasiveness in a contention that with the privilege of carrying a large supply and a corresponding reduction in cargo carrying capacity, the vessel, not the charterer, assumed the burden of the draught of water in leaving the loading port. Suppose that instead of 400 tons, the master of the vessel had put a still larger quantity in her bunkers at some place where it could be purchased at a low price and had come to the loading port so burdened with coal that she could only carry the minimum quantity of cargo provided for. It would seem under such circumstances that dead freight could not be collected from the charterer— Shipping Co. v. Forbes (D. C.) 99 Fed. 102, 105—yet the carriage of the larger quantity of coal might be reasonable from the vessel's point of view. I regard it as more consistent with the probable meaning of the contract that the vessel's 10% option on the quantity of cargo should be considered as intended to cover such a contingency than to hold that the full option continued to exist, notwithstanding the vessel voluntarily put it out of her power to avail herself of it. And there is another feature of the case which inclines me to decide it in

the respondent's favor. It appears that the river at Colastine was unusually low at the time of loading and by waiting, the full quantity of cargo could probably have been carried over the bar. It was the vessel's duty to wait a reasonable time. Scrutton, Charter Parties, (4th Ed.) 84–86. She did not wait at all but proceeded immediately, notwithstanding a temporary low state of water, with a partial cargo. The recovery of dead freight for the deficiency can not be allowed.

Libel dismissed.