## The Maggie Moore.

*(Circuit Court, D. Maryland.   May 28, 1881.)*

1. Charter-Party—Safe Port.

    The owner of a vessel chartered her to carry a cargo of grain from Baltimore to a *safe port* on the continent between Bordeaux and Hamburg, or as near thereto as she could always float with safety; order to be given on signing bill of lading; charterer's liability to cease as soon as the cargo was shipped, but vessel to have a lien on the cargo for all freight, dead freight, and demurrage.  When cargo had been put aboard, the master, without objection to the port, executed bills of lading for delivery of the cargo to charterers or their assigns at *Calais*, France.  The vessel was delayed in getting into the port of Calais by want of water on the bar at the mouth of the harbor, and also suffered delay in discharging because the dock was out of repair and could not admit her, and the owner in this libel *in personam* sued the charterers for damages for ordering the vessel to an unsafe port.  *Held*, that Calais being a well-known commercial port, the master, by signing the bills of lading in which Calais was named, and agreeing to deliver the cargo there, had accepted that port as a safe one, and thereby bound his owner; that the risk of the ignorance of the master, or his incompetency to decide whether or not it was a safe port for the vessel, was to be borne by the owner and not by the charterer.  *Held, also*, that the master, having accepted the port as a safe one, was bound to tender the cargo as near thereto as the vessel could get and float with safety, and that for demurrage and expenses thereafter the consignee of the bill of lading would be liable, and not the charterer, under the limitation of liability contained in the charter-party.

Appeal in Admiralty.

*Sebastian Brown*, for libellant.

*Marshall & Fisher*, for respondents.

Waite, Chief Justice.   Andrew K. Moore, the appellant and libellant, was the owner of the bark Maggie Moore, and on the twenty-fifth of August, 1879, through agents at Baltimore, he chartered his vessel to Milmine, Bodman & Co., the appellees and respondents, to take a cargo of wheat or Indian corn "from the port of Baltimore, Md., to a safe port on the continent between Bordeaux and Hamburg, both included; orders to be given on signing bills of lading; one port only to be used, or as near thereunto as she can always float with safety."   Twenty-seven running days were given for loading and discharging; and for detention beyond that, by default of the charterers or their agent, demurrage at the rate of £18 per day, day by day, was to be paid.   The charter-party also contained the following:

"The cargo or cargoes to be received and delivered alongside of the vessel, where she can load and discharge always afloat, within reach of her tackles.

Lighterage, if any, to be at the expense and risk of the cargo. The charterers' liability to cease as soon as the cargo is shipped, but the vessel to have a lien on the cargo for all freight, dead freight, and demurrage."

The vessel was loaded under the charter, and on the twenty-fourth of October her master, without objection, executed bills of lading for the delivery of the cargo to the charterers or their assigns at the port of Calais, France, a commercial port on the continent between Bordeaux and Hamburg. The master was at the time personally unacquainted with the exact character of the port, having never been there. The harbor is somewhat difficult of access, owing to a bar at the mouth, which vessels requiring the water the Moore did when loaded can only pass at spring-tide. The dock in the harbor, within which, when in repair, vessels that could get over the bar would always remain afloat, had been for 18 months so much out of repair as not to be at all stages of the tide sufficient for that purpose. Except in this dock vessels like the Moore could not float in the harbor more than two or three hours during each tide.

The Moore, with her cargo on board, arrived within seven miles of Calais on the twenty-second of November. Her master was there informed by the pilot that on account of the tides it would be impossible to get her into the harbor for eight days. She was then taken to the downs, 21 miles from Calais, where she lay at anchor until the thirtieth of November. In the mean time her agent in London was in communication with a broker in Calais to find out when she could be got in. On the 30th, without waiting to hear further, her master engaged a tug and was about making another attempt to take the vessel over the bar, when he was told that a bark was aground in the mouth of the port and nothing could get in or out. He then went ashore and protested against the place to which the vessel had been sent under the charter. In hoisting an anchor at the downs so as to change the anchorage ground the windlass of the vessel was broken. In this and other ways she was detained, so that she could not take advantage of the tides and get over the bar at Calais until December 15th. She then got into the harbor, but was unable to pass over the sill at the gate of the dock with the water she was drawing. Notice was then for the first time given the consignees of the cargo of her readiness to discharge, and on the 17th she began unloading at the tidal quay outside the dock. After enough of the cargo had been taken out to enable her to pass the gates of the dock it was found she could not get a berth inside at which she could unload for some days, and an arrangement was made with the consignees by which

the delivery was to be completed outside. Under this arrangement the unloading was finished on the fifth of January.

This suit was begun against the charterers *in personam* to recover such damages as the vessel sustained by her detention over and above what was covered by the provisions in the charter-party for demurrage, on the ground that Calais was not a safe port. There is no allegation in the libel of any specific damage to the vessel from grounding while in the harbor, and no injury to the vessel while she was detained is shown except the breaking of the windlass in getting up the anchor at the Downs. Upon these facts, which are undisputed, the district court dismissed the libel, and from that decree this appeal was taken.

The question which, as I think, lies at the foundation of the case is not whether Calais was a safe port, or whether if objection had been made at the time the vessel could have been required to go there under her charter, but whether, having gone without objection, the charterers are liable to the owner, under the provisions of this charter-party, for her detention while waiting to get over the bar and into the harbor. The charter-party did not fix definitely the port to which the vessel was to go. That was to be settled when the bills of lading were signed. The liability of the charterers, as charterers, was to cease when this cargo was shipped. Shipment is complete when the cargo is on board and bills of lading delivered. The vessel could not be required to go to a port which was not, in law, safe. From this it seems to me clear that, so far as the charterers' liability is concerned, the owner is limited, in respect to his objections to the port, to the time when he signs the bills of lading. If he accepts the port and gives bills of lading agreeing to deliver accordingly, he relieves the charterers from the liability under the charter on account of the port to which his vessel is to be sent, and transfers his claims for compensation from them to the cargo. Should he refuse to sign bills of lading for the designated port, the question would be at once presented between him and the charterers whether the port was a safe one. If it was, he would be liable to the charterers for a breach of his contract. If it was not, and the charterers refused to load for another port, they would be liable to him. If he accepts the port, as the bills of lading are to be construed in connection with the charter-party, his vessel would be bound to go only so near the port as she could always float with safety, and the consignees of the cargo could be required to accept a delivery of the cargo there. Demurrage would begin on the arrival of the vessel at that place and an offer to deliver

there. If the consignee refused to receive the delivery at that place, he would be chargeable with the extra expense incurred by the vessel on that account. Such I understand to be the effect of the cases. *Capper* v. *Wallace*, L. R. 5 Q. B. 163; and *The Alhambra*, in the court of appeal, London, decided on the twenty-fifth of March last, a newspaper report of which has been furnished me. By signing the bills of lading the owner, through the master, agreed with the charterers that Calais was a port to which the vessel might be sent under the charter. His compensation, after that, was confined to such as he was entitled to upon the delivery of the cargo which he thus conceded the charterers had rightfully shipped.

It is contended, however, that, as the master was ignorant of the exact character of the port to which the shipment was made, the owner is not bound by his acceptance. The master was the agent of the owner to receive the shipments under the charter and sign the bills of lading. He could not alter the terms of the charter-party, but he was the representative of the owner in performing what it had been agreed should be done. If the owner would have been bound if he had personally accepted Calais as a safe port under the charter, he is bound by what has been done by the master. The master could not change the charter-party and agree, in express terms, to go to an unsafe port; but when a shipment was tendered him under the charter, for delivery at a well-known commercial port like Calais, to which vessels were accustomed to go, it was his duty to decide for the owner whether to sign the bills of lading or not. If he refused to accept the shipment and carry under the charter, his refusal was a breach of the contract, and bound the owner for damages in case the designated port was in fact a safe one. So, in my opinion, if he accepted, he bound the owner to deliver as the charter required. It was the duty of the owner to decide when the shipment was made whether it should be accepted under the charter. He deputed the master to perform that duty. The master decided to accept. That decision bound him. The risk of the incompetency of the master was on the owner and not the charterers.

I am entirely satisfied that the court below was right, and a decree may be prepared dismissing the libel.