TWEEDIE TRADING CO. v. NEW YORK & BOSTON DYEWOOD CO.

(Circuit Court of Appeals, Second Circuit. December 23, 1903.)

No. 27.

1. SHIPPING—CONSTRUCTION OF CHARTER PARTY—INABILITY TO LEAVE PORT WITH FULL CARGO—DEAD FREIGHT.

A charter party fixed the port of loading on a South American river, and the amount of cargo at 2,000 tons, 10 per cent. more or less at the vessel's option. After reaching the port she elected to take 2,200 tons, but, when 1,900 had been loaded, she refused to load more because if she did so she would be unable to cross a bar in the river 50 miles below. The charter party required the charterer to furnish the cargo "within reach of the ship's tackles at ports of loading and discharge where steamer can always safely lie afloat; lighterage, if any, to be at expense and risk of cargo." Both parties had knowledge of the bars and of the stage of water usually prevailing at that season. *Held*, that such provision was not equivalent to one that the vessel should go to the specified port, or "as near as she can safely get," and could not be construed to require the charterer to lighter the additional 300 tons of cargo to the steamer after she had passed the bar, and that it was not liable for dead freight because of its refusal to do so.

Appeal from the District Court of the United States for the Southern District of New York.

Appeal from decree in admiralty dismissing libel for an alleged breach of charter party of the steamer Endsleigh. The steamer was chartered on January 29, 1901, to the respondent for the transportation of a shipment of quebracho wood from Colastine, Argentine Republic, to New York. Opinion below reported in 118 Fed. 492.

Everett P. Wheeler and Charles S. Haight, for appellant.

Wilhelmus Mynderse, for respondent.

Before LACOMBE and COXE, Circuit Judges, and HAZEL, District Judge.

HAZEL, District Judge.   We concur in the conclusions of fact and law stated in the opinion of the court below, which determine that neither dead freight nor demurrage is recoverable.   The facts are these:   By the terms of the charter party, the Endsleigh was to proceed with all reasonable dispatch from the port of Rosario to the port of Colastine, on the Parana river, there to be loaded with 1,500 tons of quebracho wood, 10 per cent. more or less at the vessel's option.   The cargo was to be furnished by the respondent.   The agreement was modified on April 15, 1901, increasing the quantity of the contemplated shipment by 500 tons, and an additional 10 per cent. more or less at the option of the vessel.   The rate of freight was slightly changed, but in all other respects the original charter party remained unaltered. The steamer was 285 feet in length.   Her draft, when laden, was 20 feet 6 inches, and her capacity was 3,500 tons.   The port of loading was approximately 120 miles above the port of Rosario, and between these ports there were two bars extending across the river, one 6 miles and the other about 50 miles below the port of loading.   When the agreement as to quantity was modified as above stated, the existence of these bars and the varying depth of water in different seasons of the year were known to both parties.

The terms of the charter party which need to be construed bound the charterers to furnish the cargo "within reach of the ship's tackles at ports of loading and discharge where steamer can always safely lie afloat; lighterage, if any, to be at expense and risk of cargo."   This provision was added in writing at the end of the printed form of the agreement.   It appears by the proofs that the vessel proceeded to the port of loading, the depth of water being ample, and, arriving there, she loaded with 1,900 tons only.   She declined to receive the full cargo at Colastine for the reason that she would have been unable to clear the bars below, where the depth of water was insufficient, owing to the lowering of the river (a condition which usually prevails during that season of the year), and get out to the open sea.   The vessel arrived at Colastine on May 15, 1901, and immediately elected to take 10 per cent. more than 2,000 tons of cargo.   Between the date of her arrival and May 29th, while the vessel was loading, the river receded 9 inches. Even then there was an abundance of depth of water at the port of loading for a vessel of the draft of the Endsleigh, but over the bars the depth of water was insufficient to carry a greater amount of cargo than 1,900 tons.   At the time the master of the Endsleigh elected to take the increased cargo, the river was falling; and subsequently, on May 28th, the vessel's draft then being 16 feet 9 inches aft and 16 feet 7 inches forward, she declined to receive more than 1,900 tons.   This, as above stated, was then on board, in addition to 400 tons of coal.   Soundings taken over the first bar a few days before the ship was loaded, and while the water was receding, disclosed a depth of water of about 18 feet, and at the lower bar 16 feet 11 inches.   Thus the vessel was just enabled to clear the bars with the water she was drawing.   Before leaving the port of loading the master of the Endsleigh requested that the balance of the cargo be lightered out beyond the bars.   This the agent of the charterer refused to do, claiming that as the charter party provided, in terms, for loading at Colastine, the provisions of the agree-

ment in respect to lighterage referred only to lighterage at the ports of loading and discharge, and not outside of the bars. According to the libelant, the provision of the contract which requires loading the full cargo at a point where the steamer "can always safely lie afloat" contemplates free access to the sea, and whenever conditions arise which prevent loading the agreed cargo at the designated port, on account of the insufficient depth of water, or the inability of the vessel to safely clear the bars, the charterer is in default, and answerable in damages, unless the charterer lighters the cargo to a place of free egress to the sea. The authorities hold that the phrase ordinarily incorporated in charter parties, that the vessel shall go so near to the designated port "as she can safely get," refers to the vessel's safety in going to the port of loading, and also leaving the same when loaded, and whenever she is unable to get away with the full cargo, because of the reefs or bars, the charterer is held to a strict fulfillment of his undertaking. Shield v. Wilkins, 5 Exch. 304; Bacon v. Ennis (D. C.) 110 Fed. 404; Mencke v. A Cargo of Sugar, 187 U. S. 249, 23 Sup. Ct. 86, 47 L. Ed. 163. But we think the principle enunciated in these cases is not strictly applicable here. The charter party is devoid of any allusion to the vessel's approaching as near to the port of loading as she can safely get, and the court cannot supply a provision which manifestly was contrary to the expectation and understanding of all parties to the contract.

The libelant also contends that under the clause, "always safely lie afloat; lighterage, if any, to be at the expense and risk of cargo," the same legal construction follows as that which is given by the authorities above cited to a provision that the vessel shall go to the specified port, "or as near as she can safely get." We do not assent to the proposition that the former provision is the equivalent of the latter, in the absence of an intention to so regard it by the parties. We think the District Court was right in receiving evidence to show what the actual intention was with respect to scarcity of depth of water to enable a full freight to be carried beyond the reefs. As the proofs disclosed that the libelant possessed full information regarding the existing conditions, and of the sudden changes at that season of the year in the depth of the river below Colastine, it is difficult to conceive of any sound reason why the vessel should not be held to have assumed all risk attending her movement to and from the port of loading. Moreover, the testimony establishes that, with full knowledge of the conditions in the Parana river, the libelant increased the quantity of freight to be carried from 1,500 to 2,000 tons, plus 10 per cent. These facts found by the District Court certainly presuppose that the owners were willing to accept the specified port as a safe one, and without the customary qualification that the vessel shall "go as near as she can safely get." The Maggie Moore (C. C.) 8 Fed. 620; The Gazelle (D. C.) 11 Fed. 429.

The construction which the court below places upon the lighterage clause is not only reasonable, but is substantiated by the proofs. It appears to have been the intention of the charterer to obtain the services of a vessel of such dimensions and draft as would take a cargo out beyond the bars without requiring lighterage; hence the provision that the vessel shall load and discharge where she can always safely lie

afloat can be given no other construction than that the respondent became bound to assign to the ship a berth in a suitable depth of water at the specified port of loading and at the port of discharge, and, upon respondent's failure to do so, the expense of lighterage was to be borne by it. The theory of libelant, that the lighterage clause had no application to the port of loading, for the reason that enough depth of water is generally found at the loading port, and accordingly usage and custom of the port require lighterage below the bars, is not borne out by the evidence. It is a correct principle of law that a charter party shall be interpreted not only in furtherance of usage and custom of trade, but also in accordance with the true and reasonable intendment of the parties. Raymond v. Tyson, 17 How. 53, 15 L. Ed. 47. The words added in writing to the printed provision can be given no greater effect and significance than they reasonably import.

These views render it unnecessary to discuss the point respecting the supply of coal carried by the Endsleigh, on account of which she was unable to take the full cargo from the loading port.

The decree of the District Court is affirmed, with costs.