**PAN CARGO SHIPPING CORPORATION, Libelant,**

v.

**UNITED STATES of America, Respondent.**

**UNITED STATES of America, Libelant,**

v.

**PAN CARGO SHIPPING CORPORATION, Respondent.**

United States District Court
S. D. New York.

March 24, 1964.

624

Healy, Baillie & Burke, New York City, for Pan Cargo Steamship Corporation; Nicholas J. Healy, 3rd, Richard T. O'Connell, New York City, of counsel.

Robert M. Morgenthau, U. S. Atty., for United States; Gilbert S. Fleischer, Louis E. Greco, New York City, of counsel.

WYATT, District Judge.

These two admiralty suits were consolidated for trial by order made under Admiralty Rule 13 of this Court. After trial and full consideration, the decree will be for respondent in No. 196–272 and for libelant in No. 199–144.

There is virtually no dispute in No. 199–144, wherein the Government sues for the reasonable value of fuel oil delivered for the bunkers of the ship of respondent in that suit.

The substantial controversy is in No. 196–272 and the terms "libelant" and "respondent", when used hereinafter, refer to the parties as they appear in No. 196–272.

Libelant Pan Cargo Shipping Corporation (Pan Cargo), a New York corporation, made a voyage charter party for its tanker "National Peace" to carry a

cargo of oil for the Military Sea Transportation Service of the United States Navy. The charter party is dated December 3, 1957. According to the charter party, the oil was to be taken to a Far East port from "one or more safe ports in the Persian Gulf, Charterer's Option". When the Peace went to the Saudi Arabian port named by the Navy, the Saudi Arabian government would not permit her to load any oil, this because she had made a call some months before at one or more Israeli ports; the Arab countries have shown their hostility to Israel by means of boycotts and otherwise. The Navy cancelled the charter party, giving as its reason that the ship had not been ready to load as provided in the charter.

Libelant sues for $160,110.16 as damages for a claimed wrongful cancellation by the Navy of the charter party.

The issue is thus whether the consequences of the prohibition by the Saudi Arabian government against loading cargo are to be borne by the libelant or by the Navy.

A brief glance at the geography of the area in and about the Persian Gulf and at a little recent Mid-East history will enable the events in suit to be better understood.

The Kingdom of Saudi Arabia was unified by the prophet Mohammed in the seventh century. It has two capitals, Riyadh in the interior and Mecca near the western (Red Sea) coast. The United States Embassy is at Jiddah on the Red Sea near Mecca. Saudi Arabia has tremendous deposits of petroleum under its eastern coastlands along the Persian Gulf. An oil concession in this area has been extensively developed by a group of oil companies from the United States, operating through Arabian American Oil Company ("Aramco"). Aramco is owned: 30% by Standard Oil Company of California, 30% by Texaco, Inc., 30% by Standard Oil Company (New Jersey), and 10% by Socony Mobil Oil Co. Inc. The oil of Aramco is exported from the Persian Gulf port of Ras Tanura (in Saudi Arabia).

About 50 miles from Ras Tanura (by road) is the town of Dhahran, developed in recent years by Aramco for offices and other facilities and by the United States as an air base. Nearby is the Saudi Arabian town of Dammam. The only United States Consulate in Saudi Arabia is at Dhahran.

About 35 miles southeast of Ras Tanura is the Sheikdom of Bahrain, exercising sovereignty over Bahrain Island, an important oil refining center from which much oil is exported. A major oil enterprise in Bahrain is that of Bahrain Petroleum Co., Ltd. ("Bapco"), 50% owned by Texaco, Inc. and 50% owned by Standard Oil Company of California. The wholly owned marketing subsidiary of Bapco is California Texas Oil Co., Ltd. ("Caltex").

At the northern tip of the Persian Gulf, some 240 miles north and slightly west of Ras Tanura is Abadan in the Kingdom of Iran (Persia). Abadan is a very large oil refining and exporting place; it is in the delta of the Shatt-al-Arab, a river formed by the junction of the twin rivers of ancient Mesopotamia. Oil tankers can go past Fao, an Iranian port on the Persian Gulf, and up the river a few miles to Abadan. Iran is not an Arab country and of course not a member of the Arab League.

The Navy for some years has been taking oil from the Persian Gulf under a contract with Caltex, which has the option to deliver the oil either at Bahrain or at Ras Tanura (where Caltex apparently has some arrangement with Aramco, understandable in view of the connection of the two companies through largely common ownership). Thus, whatever its charters may specify as loading ports in the Persian Gulf, the Navy in fact has been loading oil for some years at only the two ports of Bahrain and Ras Tanura.

The Persian Gulf is closed at its northwestern end; ships can only leave the Gulf through the passage at its eastern end into the Gulf of Oman and thence into the Arabian Sea

At the head of the Red Sea is the Gulf of Aqaba and at the head of the Gulf of Aqaba is the port of Elath in Israel, at the extreme southern tip of Israel. The significance of this is that it is possible for a tanker to carry oil from a non-Arab port (for example, Abadan) to Elath and thus avoid Saudi Arabia and the Suez Canal.

The sovereign State of Israel was established on May 14, 1948. Since that time there has been continued hostility toward Israel on the part of the Arab countries, with border incidents, belligerent action, and the like from time to time. The Arab countries, or most of them, joined in an Arab League. From time to time beginning at least as early as 1954 news stories appeared widely in the press of a boycott by one or the other Arab countries of ships which traded with Israel. For example, in September 1954 the legislature of Syria passed a law providing that any foreign vessel which "had previously called at Israeli ports" could not load or discharge cargo at a Syrian port unless the Syrian executive authorities in the exercise of a discretion removed the ban after a guarantee by the owners of "future non-cooperation with Israel". See The Nizeti, [1960] 1 Lloyd's Rep. 132, 133, 136 (Court of Appeal, 1959).

The existence of the Arab boycott against Israel was a matter of general knowledge; the specific details of its enforcement and the names of the ships on an Arab blacklist were not generally known.

In June 1956, The New York Times had an account of a complete boycott of Israel ordered by the Sheik of Bahrain. This order attracted particular attention because Bahrain, while Arab, had not joined the Arab League, its foreign affairs being handled by the British Foreign office.

In July 1956, Egypt nationalized the Suez Canal. In late October and early November, 1956, there was the so-called "Suez crisis", known all over the world and recognized as a threat to world peace. Israel invaded part of Egypt, supported by British and French troops. Various pressures brought about a prompt withdrawal of all foreign troops from Egypt and the crisis passed. The enmity of the Arab countries toward Israel, however, was increased and inflamed.

Libelant bought from the United States Maritime Administration in December 1956 the steam tanker Memory, an American Merchant Marine T–2 type tanker of United States registry (this ship is sometimes called herein "Memory I"). Shortly after taking delivery of the vessel in February 1957, libelant time chartered it for three years to a Swiss corporation. The vessel sailed from Houston, Texas, on February 28, 1957 with a cargo of oil for Tel Aviv, Israel. Information as to this voyage was duly reported in normal course on Maritime Administration forms at the Custom House in Houston. The log shows that the cargo was discharged at Haifa in Israel on March 20 and 21, 1957; that the vessel was in Haifa until March 26 when she went to Jaffa (also in Israel) and was there or off Tel Aviv until March 31.

Shortly after this visit to Israeli ports, libelant applied to change the ship's name from "Memory" to the "National Peace". The reason for the change was stated in the application to be: "present name undesirable to owners". Testimony for libelant was that it wanted to have the name "National" as part of the name of all its ships, that it owned one other ship of United States registry, and that it owned three ships of foreign registry. Authority for the change from "Memory" to "National Peace" was granted by the Bureau of Customs on April 19, 1957.

National Shipping & Trading Corporation ("National"), a New York corporation, was closely affiliated with libelant. The record does not disclose the precise facts as to this affiliation but Pan Cargo (libelant) and National were owned by the same, or substantially the same, interests.

In March 1957—about the same time that the name of Memory I was being changed to National Peace—National bought and took delivery of the steam

tanker "Birch Coulie", also an American Merchant Marine T–2 tanker of United States registry. National then changed the Birch Coulie to Liberian registry and sold it to Panexito Compania Naviera S.A. ("Panexito"), a Panama corporation. National and Panexito are owned by the same, or substantially the same, interests. Panexito changed the name of the Birch Coulie to "Memory" (sometimes called herein "Memory II").

The three year time charter between Pan Cargo and the Swiss corporation was next assigned by Pan Cargo to Panexito; Memory II was then substituted under the charter for Memory I and went into the trade of carrying oil between Iranian (and thus non-Arab) ports and Elath, Israel.

After these various maneuvers, the ownership group, whether by accident or by design, had the best of all possible answers to the interference with trade caused by the Arab boycott. They had Memory II carrying oil to Israel without risk of Arab obstruction. They had Memory I under a new name and as the National Peace it could hopefully carry oil from Arab ports; the supposition could reasonably be (a) that an Arab country would not know of the call by Memory I at the Israeli ports, or (b) that if the call were known it would not be connected to the newly named National Peace but rather to Memory II which was continuing the Israeli trade.

During 1957, there were many references in the press to the Arab boycott of Israel. There were such references, for example, in The New York Times of March 20, May 7, August 5, August 9, August 30, September 5, October 15, October 16, October 27, November 18 and November 30. The Times on October 15, 1957 carried a report of a complaint by Israel in the United Nations that, among other things, the Arabs kept "up to date" a "blacklist of all ships that call at Israeli ports", including ships of United States registry. The next day, the Times carried a report that the Arabs had admitted in the United Nations the truth of Israel's complaint. On November 18,

1957, the Times reported that the American Merchant Marine Institute had advised its members that Kuwait (also on the Persian Gulf) had joined an "Arab League boycott of Israel" and that ships would be blacklisted which carried oil (among other things) to Israel.

In early 1957, Israel chartered the tanker "Kern Hills" to take oil to the port of Elath. This caused a violent reaction from the Arabs, who considered oil to be contraband and who declared that they would blacklist the Kern Hills and any other ship taking oil to Elath. The incident was widely discussed in shipping circles.

In July 1957, the "Memory" was placed on the blacklist of two Arab countries (Lebanon and Iraq). There is nothing more in the record as to a vessel by this name being on a blacklist but it is a reasonable assumption that the "Memory" was on the blacklist of all Arab countries. The "Memory" is described on the blacklists as of Liberian registry. Whether this was a deliberate reference to Memory II or was the product of confusion cannot be known. There is no evidence that libelant knew that a "Memory" was on the blacklist.

The management of libelant did know from at least 1955 or 1956 of a boycott by "all the Arab nations * * * against ships that traded with Israel" (SM 275). According to libelant's president, this was "public knowledge". While "primarily concerned" with difficulty in transit of the Suez Canal, he was "aware of some boycott by the Arab countries. They would boycott a ship that had traded, that had called at an Israeli port" (SM 276); it was "general and very vague knowledge" that Arab countries "would possibly refuse to load or unload a ship that had previously been to Israel" (SM 277). Libelant's president knew of the Kern Hills incident in early 1957. He read the New York Times and when asked whether in 1957 he read about an Arab blacklist, he said "Maybe; it is possible" (SM 306); he knew there was "some kind of an Arab boycott" (SM 307).

It is perfectly clear that libelant knew in November and December 1957 that a ship which carried oil to an Israeli port would, if such fact were known to the Arabs, be blacklisted by all Arab countries and would by them be refused any cargo of oil at any of their ports.

In late November 1957, the Navy invited offers of United States registry tankers for charter to lift oil from Persian Gulf ports. The National Peace, with the authority of libelant, was offered by a ship broker. If it be wondered why libelant would authorize such an offer in the face of the Arab boycott, the answer seems plain. Libelant believed that the risks were minimal because the Arabs might not know of the one voyage of Memory I to Israel and, if they did know, would not recognize Memory I under its new name "National Peace", especially since Memory II was openly in the Israeli trade under the name "Memory".

After brief negotiations the Navy accepted the offer of the National Peace for a single voyage. The date of the fixture was December 3, 1957. Shortly thereafter, the Navy and libelant agreed on a second voyage. A charter party, dated as of December 3, 1957, was then drawn up by libelant's broker and executed by the parties; execution by the Navy apparently was after the events in suit but this is of no significance as the terms were all understood at the date of the fixture and the rights of the parties are governed by the written charter party embodying these terms.

The broker for libelant made at least one change in the language of the charter from that specified by the Navy and confirmed in its fixture letter. The loading ports had been specified by the Navy as "one or more ports Persian Gulf". The broker changed this to read "one or more *safe* ports in the Persian Gulf" (emphasis supplied). The unloading ports had been specified by the Navy as "one or more ports Japan/Philippine Islands * * * etc.". The broker changed this to read "one or more *safe* ports Japan/Philippine Islands * * * etc.". (emphasis supplied)

When the parties fixed the charter, no one for libelant advised the Navy of the Israel trip of the Peace under her former name, nor was the Navy aware of this trip. No one for the Navy ever asked whether the Peace had been to Israel. The negotiator for the Navy testified (SM 124) that had he known of the Israel trip he would not have chartered the Peace (doubtless because of danger of boycott trouble at any ports of members of the Arab League).

At times both before and after the charter of the Peace, the Navy has put a provision (often called a "Haifa clause") in its charter parties reading as follows:

> "In event the vessel is prevented from loading in a Persian Gulf port by the local authorities because of the vessel having previously traded with Israel, the Charterer shall have the option either to cancel the Charter as of the date loading is refused, or to nominate another loading port and the expenses incurred thereby shall be for the Owner's account. Extra miles traveled steaming to the nominated port shall not be included in the computation of mileage as provided in the Adjustment of Freight Clause."

The position of the Navy is that while this clause may be useful as a warning to the vessel owners of possible trouble, it adds nothing to the right claimed by the Navy absent such a provision to cancel the charter if the vessel is prevented by the Arab boycott from loading.

On December 6, 1957, the Navy notified libelant that the Peace should load its oil cargo at Bahrain or at Ras Tanura. The Master was to be instructed to report to the Commander, United States Naval Forces Middle East via radio Bahrain for loading instructions 48 hours before arrival and to address Aramco in advance of the arrival via Radio Station HZA.

The Peace left Bombay on December 14 for Bahrain; Peter H. V. Bamberg was her master.

The designated ship's agent for the Peace at Bahrain and at Ras Tanura was

Gray, Mackenzie & Co. Ltd. ("Gray"). The manager of Gray at Ras Tanura was Page.

On December 14 or 15, Bamberg notified the Navy at Bahrain that his expected time of arrival was 5 p. m. on December 17 and asked instructions.

In the morning of December 16, Bamberg received a message from Gray at Bahrain that the Navy had instructed the vessel to load at Bahrain.

The next morning (December 17), however, Gray at Bahrain sent a message to Bamberg that the Navy had instructed the vessel to load at Ras Tanura instead of Bahrain. The course from Bombay is the same both for Bahrain and for Ras Tanura up to a certain point; this point had not yet been reached when the message was received changing the loading port to Ras Tanura. The vessel therefore continued on the same course.

On December 17, while the vessel was steaming toward Ras Tanura, Aramco advised Bamberg that it held an oil cargo for his vessel and asked his bunker needs. In reply Bamberg stated he needed 1375 tons (9075 barrels) of bunkers; he also advised Aramco that health conditions on the vessel were good and health cards were in order.

The vessel went directly to the dock at Ras Tanura, arriving there about 10 p. m. (2200) on December 17. In half an hour (2230), the vessel was all fast at the docks, meaning that "the ship is tied up securely; all lines are out and the ship is properly docked". The ship began discharging her water ballast. There was a guard to prevent anyone from going ashore from the ship; the deck officers were prevented from stepping on the dock to read the ship's draft.

No vessel may communicate with the shore in a foreign port, in the sense of persons leaving the vessel or coming aboard the vessel or loading or unloading cargo or taking on stores, without prior permission of the shore authorities. The grant of this permission is usually under the authority of medical officers, the danger normally apprehended being from contagious diseases among passengers or crew. The permission itself is generally called "pratique" or "free pratique". Apparently the Saudi Arabian government exercises strict vigilance over any landings before pratique is granted. The information booklet published by Aramco states: "Ship's personnel and passengers are not permitted ashore for any purpose whatsoever until Pratique has been granted. This regulation includes going to the wharf to read the ship's arrival draft."

Shortly after arrival, a Saudi Arabian official, a health officer, came aboard (with a runner from the ship's agent) and asked to see *all* the ship's logs. He did not look at any health records and evidently had knowledge that the ship was on an Arab blacklist. He looked at logs, saw in March 1957 a trip to Israel, then became excited, and directed that discharge of ballast be stopped. He left the vessel; discharge of ballast had not been completed when it was stopped on his order. The Saudi Arabian official came back in about twenty minutes and said that free pratique was refused and that the ship could not load but must leave the dock at once and go to anchorage in the roadstead until a decision could be made by the authorities. He then disembarked for the second time. The ship left the dock as ordered and went about two miles due east and anchored. It never thereafter came any closer to shore nor did the master or any member of the crew ever set foot on shore.

When the Peace arrived at Ras Tanura, she had about 985 barrels of bunkers; the owners had arranged for 1700/1900 tons (11,220 to 12,540 barrels) of bunkers to be supplied by Caltex at either Bahrain or Ras Tanura; Bamberg had radioed ahead his bunker needs as 9,075 barrels. Normally a vessel going to the Persian Gulf would bunker there because the oil is cheaper there.

The Naval headquarters in the Persian Gulf was at Bahrain. There were Navy inspectors of material at Bahrain and at Ras Tanura. Their chief duties were to

test for specifications the oil cargo to be loaded and also to inspect the tankers before loading to see that their tanks were clean and tight, that all cargo from the last voyage was out, and that there was no danger of contamination. The cargo to be delivered to each tanker was actually segregated in advance at Ras Tanura and the tanks sealed. If the inspectors found the tanker in order, they so signed the log.

Prior to arrival of the Peace at Ras Tanura, her oil cargo had actually been segregated, had been inspected by the Navy, and had been approved.

A Naval inspector went to the dock when the Peace came alongside in order to inspect her tanks. He could not do so because he could not get aboard; the presence of undischarged ballast would also have prevented inspection. (Several days later the inspector sent a radio stating, in answer to an inquiry, that "medical clearance" had been "granted" on December 17 to the Peace; this was hearsay information and was totally incorrect.)

Early on the morning of December 18, the Navy inspector at Ras Tanura sent a priority radio to the Navy in Washington reporting the inability of the Peace to load and recommending that she load at Bahrain instead. The reply from Washington that day stated among other things: "Caltex advises * * * loading Bahrain cannot be accomplished".

On December 18, Bamberg advised the Navy at Bahrain that the vessel was "not permitted loading Ras Tanura due former voyage to Haifa" and asked for an alternate loading port. Page, agent for Gray at Ras Tanura, came aboard the Peace that day. At the suggestion of Page, Bamberg sent a message to the owners in New York advising that if authority were given him to pledge to the Saudi Arabian officials that the vessel "will not at any time in the future trade with Israel" it might be possible "to lift the ban against loading in this port". A second message from Bamberg told the owners that a guarantee at Ras Tanura was not acceptable and that arrangements

must be made through the Saudi Arabian Embassy in Washington.

On December 19, Bamberg sent a radio message to Aramco stating that the vessel had docked on December 17 but had been removed "for reasons unknown", that she had been "in every respect physically ready to load", and that he regarded her "as accepted by you". The reply from Aramco was that the "cargo nomination" had been cancelled and that Bamberg should "contact operators for instructions". Bamberg then radioed the Navy at Bahrain asking for confirmation that the cargo had been cancelled.

On December 19, Page again came aboard and, as authority had been received from the owners, a paper was prepared (called an "affidavit") which Page took ashore to deliver to the Saudi Arabian officials. The "affidavit" set forth the text of a message from the owners; this message not only certified that the vessel would never again call at an Israeli port but explained that the one time when the vessel had called at an Israeli port she had been time chartered to a Swiss corporation, that the cargo had not been carried for the owners but for the charterers, and that subsequently the vessel had been withdrawn from the charter. Bamberg begged reconsideration of the "first decision not to permit the ship to enter your port and lift her cargo". Bamberg also asked Page at this time to try to prevail on the local officials to cable the Saudi Arabian consulate in New York to hear from the owners their explanation of the call at an Israeli port.

On December 20, the owners authorized Bamberg to spend money in his discretion for legal or other fees to clear away the obstacles; on the same day Bamberg asked Page to secure the help of a local authority on international law (apparently this was not forthcoming). Page was aboard that day also and then advised Bamberg that no bunkers could be obtained at Ras Tanura and probably not at Bahrain either. Page and Bamberg agreed to request the Consul to do everything to secure permission for the vessel to load its cargo. At Page's sug-

gestion, Bamberg sent a message to the owners advising them to submit to the Saudi Arabian Embassy in Washington an explanation and also a guarantee against any future trade with Israel. At Bamberg's request, Page took the current log book ashore in order to secure some notation therein by the Saudi Arabian officials as to their denial of entry to the vessel. Later in the day, Page radioed Bamberg that this message had been received from the Navy: "unable confirm cargo cancellation. Impossible change loading port unless authorized by Caltex New York. Comsts advises still attempting your clearance Ras Tanura.".

Page wrote to Bamberg under date of December 20 that the government had "refused to permit your vessel formal entry on account of its having visited Israel", that unless a guarantee were given not to trade with Israel again the vessel "will remain blacklisted", that Aramco had received the "telegraphic notice of readiness" but would not accept it "as the ship was refused entry".

On December 20, libelant gave formal notice to the Navy in Washington that the vessel had berthed on December 17 and had been "in all respects ready to load" and that laytime commenced at 2330 on December 17; libelant added that the owners were making "every possible effort secure permission load cargo and willing cooperate further by loading second Persian Gulf port such as Abadan".

On December 21, Page went to see the United States Consul at Dhahran; he had not been able to get permission for Bamberg to come ashore for the purpose. Page learned from the Consul that he could do very little except inform the State Department in Washington, and the Embassies at Jiddah and Cairo and try to have "minimum delay" for approval of the Peace by the Arab League Boycott Committee. On the same day, Page went to see the Saudi Arabian authorities at Dammam but they said they had no authority to permit the vessel to load and that it would be "some weeks" before

the vessel "is removed from the blacklist".

In a message sent to the owners on December 21, Bamberg pointed out that the Navy was avoiding any direct contact with him, all communications originating from Bapco or Aramco.

Page came aboard on December 22, bringing with him the current log book with writing in Arabic across one of the log pages for December 19 which Page translated into English as follows: "From the Quarantine officer signed [or illegible]. Refgix ship is not allowed to have the cargo in this country 20 Dec. 1957". Page also brought on December 22 a "permit of departure" signed on behalf of the Kingdom of Saudi Arabia, "Ministry of Health Quarantine Administration". This type of document is a "clearance" and is essential to permit the vessel to enter its next foreign port. The date opposite the signature is December 22 but the "date of permit" is given as "17/12/57" (obviously December 17, 1957), consistent with a Saudi Arabian view that the "departure" of the vessel was the same as her arrival at port. On the permit of departure are written, by the signing official, these words in English: "Note: ship rejected from Ras Tanura because she was trading with occupied Palestine".

The news from Page on December 22 was all bad. Far from permitting the cargo to be loaded, the officials asked that the vessel leave harbor and would allow no more visits by Page or his runner to the ship. Her bunkers then held 700 barrels of oil, with no chance to secure more fuel oil (or water or stores) at Ras Tanura or from any ship there (because a ship supplying the National Peace would itself be blacklisted). Page advised Bamberg that it was "certain that news that your ship is off the blacklist will not be through before the cancelling date of the charter party". Because of the "small amount of bunkers on board", Page urged that the owners make "alternative arrangements". When Page went ashore on December 22 he took with him a written notice signed by Bamberg addressed

to the Navy "officer in charge" at Ras Tanura and stating that laytime had commenced. The notice was the same as that given in Washington; receipt by the Navy was acknowledged by the inspector at Ras Tanura; the original notice from Bamberg was sent by the inspector to Washington. Bamberg tried for bunkers by radio on December 22 to Gray at Bahrain.

On December 23, the vessel was still at anchor, operating one boiler, bunkers at 664 barrels, isolated except for radio contact. According to a message that day from the owners, the State Department had asked the Consul to "render full assistance" and an affidavit of the owners had been sent to Saudi Arabia by cable from the Embassy in Washington.

On December 24, the isolation continued and Bamberg had a radio from Gray at Bahrain that "New York" (presumably Caltex) had decreed against supplying any bunkers to the ship; Bapco at Bahrain had advised Gray that "New York" ruled against supplying any bunkers to the Peace at Bahrain.

On Christmas Day, United States Vice Consul Muller came aboard with local officials for a visit of about an hour and a half. The subject of discussion seems to have been limited to securing a supply of bunkers. Nothing was made definite but apparently the air was hopeful.

On December 27, Bamberg renewed his radio pleas to Gray at Bahrain to make every effort on bunkers and to notify the Consul General and Aramco.

On December 28, under instructions from the owners Bamberg sent the following message to the Navy in Washington: "American Tanker National Peace at Ras Tanura in distress running out of bunkers. Safety American citizens and property in jeopardy. Please order American Navy Supply us seven hundred tons bunkers soonest".

On December 29, Bamberg received a message from the owners that the Navy was willing to supply bunkers at sea (that is, out of the territorial jurisdiction of Saudi Arabia) sufficient to get the

vessel to Abadan. He was instructed to arrange a rendezvous at sea with a Navy vessel and to obtain maximum bunkers; that if he could secure a minimum of 250 tons (1650 barrels) the vessel should return to Ras Tanura; otherwise she should go to Abadan and take on 1000 tons (6600 barrels) of bunkers. On the same day, the Consul radioed Bamberg that the governor had referred the bunkering problem to his "technical advisor" and that he (the Consul) assumed a reasonable quantity of bunkers would "shortly be allowed".

On December 29, the Navy at Ras Tanura, after first indicating that the ship could secure bunkers from the Navy at Bahrain, withdrew this and radioed Bamberg asking him to steam on one boiler to Abadan if he had sufficient bunkers. He replied that he could make Abadan and that his maximum steaming range was 300 miles. Next, Gray at Bahrain radioed Bamberg that the Navy was "unable assist" (that is, would not rendezvous with him at sea); Gray advised going to Abadan. Bamberg notified the owners that he was down to 300 barrels of bunkers and was obliged to heave anchor and steam slowly to Abadan. Apparently he did get the vessel underway but the owners instructed him urgently to remain at Ras Tanura, apparently relying on a report (probably to them through the Navy at Washington) that the Ras Tanura officials would approve bunkering there. Bamberg turned the vessel around and went back to the anchorage off Ras Tanura, after having steamed 34 miles.

On December 30, Bamberg radioed the Consul and Aramco at Ras Tanura and Gray at Bahrain appealing for assistance because the ship's situation was critical (bunkers were down to 260 barrels at noon). Gray at Bahrain was asked to notify "all parties concerned" that if the ship secured no bunkers she would "black out", food would spoil, cooking could not be done, she would be helpless and the international distress appeal would have to be sent out. About midday of December 30, United States Vice Consul Muller

came aboard, told of his efforts with the Saudi Arabian government and that he thought arrangements would be made for bunkers "sufficient to remain in the harbor of Ras Tanura until our case had been decided".

On December 31, Bamberg sent a distress message by radio via the Ras Tanura station to the Governor of the Eastern Province of Saudi Arabia through the Consul at Dhahran. The message detailed the dire plight of the ship without sufficient bunkers and asked for "aid and succor" as far as to grant "sufficient bunkers".

Early in the morning of January 1, a radio arrived on board from the Consul at Dhahran advising that he would meet later that morning with the Governor with hopes that the vessel could "wait out" that day. The Consul relayed the following message from the Navy: "Notwithstanding any previous message under no circumstances will bunkers be provided National Peace by MSTS or commissioned Naval vessels. CNO cognizance". Presumably the last words mean that the Navy position was taken with the knowledge of the Chief of Naval Operations, the highest ranking Naval officer. In the early afternoon, a radio from the Consul reached the vessel, advising that his meeting with the Governor was unsuccessful, that "only central authorities can grant you any bunkerage" (which would mean further delay), and that the United States Embassy at Jiddah, the State Department and the Navy had been advised of this and of the "urgency of your situation".

At four o'clock (local time) in the afternoon of January 1, 1958, Bamberg hoisted the signal flags LV, the international signal meaning "I am in distress for want of fuel". He promptly sent radio notice of his action to the owners, to Aramco at Ras Tanura, to the Navy at Bahrain, to the United States Ambassador at Jiddah, to the Consulate at Dhahran, and to the Navy at Washington. When he hoisted the distress signal, the vessel had 180 barrels of fuel oil in her bunkers. Bamberg radioed the Con-

sul at Dhahran and the Navy at Bahrain that he would proceed early on January 2 to anchorage outside Bahrain Light Vessel "where passing ships must render aid"; he insisted that his action did not release the Navy from the charter party and that the vessel was still on demurrage. The Consul at Dhahran radioed Bamberg that the Navy Group in Dhahran had sent a message to the Naval Commander in the area stating that "no alternative appears exist to bunkering ship outside six mile limit and its proceeding from area to effective stop bunkering should take place immediately to avoid having vessel go dead in water".

The vessel proceeded early in the morning of January 2 to a position off the Bahrain Light Vessel and anchored outside territorial waters with her distress signal flying. Through Gray at Bahrain, Bamberg again tried to secure emergency bunkers on the understanding that the vessel would leave the Persian Gulf. Bunker oil was down to 100 barrels.

About the middle of the morning of January 2, a radio came to the vessel from the Consul telling Bamberg to strike his signal (he did) and that the Navy would fuel him "soonest". At about 5 o'clock in the afternoon (local time) the Navy vessel "Mascoma" came alongside the National Peace. At that time the Peace had 70 barrels of bunkers. Bamberg went aboard the Mascoma and talked to her Captain who first said that he would transfer 1800 barrels but, after a radio telephone talk with the Navy at Bahrain, said that he could give no more than 600 barrels—enough for the vessel to reach Abadan (1800 barrels would have enabled the vessel to reach Bombay outside the Persian Gulf). 600 barrels of bunker oil were transferred from the Mascoma to the National Peace; Bamberg signed for these and did not pay for them; receipt of the 600 barrels was not questioned at trial.

After receiving the life saving 600 barrels of bunkers from the Navy, Bamberg took the vessel to Abadan where on January 5 and 6 she took on without difficulty about 7000 barrels of bunkers.

Libelant had planned that the vessel return to Ras Tanura from Abadan but before such return the Navy cancelled the charter party.

The charter specified January 5, 1958 as the "cancelling date" and a further provision was as follows:

"If the vessel is not ready to load by 4:00 p. m. (local time) on the cancelling date named in the voyage order issued hereunder, the Charterer shall have the option of cancelling the voyage order by giving the Owner notice of such cancellation within twenty-four (24) hours after the cancelling date; * * * ".

Under date of January 6, 1958 the Navy gave libelant written notice that it was exercising this option and was cancelling the charter party, among other things, for failure of the National Peace to be "ready in all respects to load with clearances required of vessel by custom of loading port and laws of Saudi Arabia".

Following cancellation of the charter party, the vessel returned in ballast to the United States.

The record shows that the owners, the master, the State Department and the Consuls in Saudi Arabia did everything possible under the circumstances to obtain permission for the National Peace to load her cargo at Ras Tanura. The chief difficulty appears to have been that the rehabilitation (in Arab eyes) of a vessel which had been to Israel required action by officials of some central committee or organization of the Arab League, and this took a long time.

After the Navy cancelled the National Peace charter, her intended cargo at Ras Tanura was moved by the Delaware Sun, departing Ras Tanura on January 28, 1958.

In July 1958, the National Peace finally was taken off the Arab blacklist on the basis of a guarantee by libelant of "compliance with the regulations governing the boycott of Israel in the future". It is interesting to note that thereafter under another Navy charter, the National

Peace went back to Ras Tanura and lifted a cargo of oil without incident.

The facts have been stated in much greater detail than is probably necessary. But having stated the facts, from them the fair and equitable decision can be seen at once.

Neither side is really at fault. The loss was occasioned by the refusal of Saudi Arabia to permit the cargo to be loaded.

As between the two parties thus situated, this loss should be borne by libelant, which knew the facts as to the voyage of Memory I to Israel and which deliberately took the risk thereby created. The loss should not be borne by respondent, which did not know the facts as to the voyage of Memory I to Israel and had no control over the events disabling Memory I from loading her cargo at Ras Tanura; respondent did not get the cargo carriage by the National Peace for which it had bargained.

It remains to be seen whether provisions of the charter party prevent a decision otherwise dictated by fairness and equity.

The charter plainly provides that the charterer may cancel if the vessel is not "ready to load" by January 5, 1958. The situation here was precisely covered by that provision.

It is obvious that the Peace was not "ready to load" at Ras Tanura. She had not obtained free pratique and never did obtain it. It was the responsibility of the vessel to secure free pratique. The reasons for its refusal are wholly irrelevant. The result is the same as if Asiatic cholera or some other contagious disease were rampant on board and on this account pratique had been refused. In that event, surely libelant could not claim the vessel as "ready to load". Here, the reason for refusing pratique was not, to our understanding, a reasonable one. But the reasons for the Saudi Arabian decision in this instance are beside the point. The fact is that pratique was refused, the ship was not an "arrived" ship, and did not have entry to

the port. That lines were fast to the pier means nothing; no one was permitted to leave the ship; communication with the shore was refused. The vessel was promptly ordered away. She was never "ready to load".

█ Libelant relies principally on language from paragraph 6 of the charter, which paragraph reads in full as follows:

"6: When the Vessel has arrived at the port of loading or discharge and is ready to load or discharge, a notice of readiness shall be tendered to the Charterer or its agent by the Master or Agent by letter, telegraph, wireless or telephone. The Vessel shall be deemed ready within the meaning of this clause whether she arrives during or outside of usual business hours, whether she is in or out of berth or whether or not she has ballast water or slops in her tanks. Laytime shall commence either at the expiration of six (6) running hours after tender of notice of readiness, Vessel in or out of berth, except that any delay to the Vessel in reaching her berth caused by the fault of the Vessel or Owner shall not count as used laytime; or immediately upon the Vessel's arrival in berth (i. e. finished mooring when at a sealoading or discharging terminal and all fast when loading or discharging alongside a wharf) with or without notice of readiness, whichever first occurs."

Libelant contends that under this language laytime begins "immediately upon the Vessel's arrival in berth" without more, and points out that the Peace did arrive in berth. Libelant concludes therefore that laytime commenced.

This contention is much too facile. It would have laytime commencing whether a vessel is "ready to load" or not. Such a result flies in the face of common sense.

The contention, if accepted, would make a sharp distinction depending solely on whether the vessel went directly to a berth or not. If the vessel arrives but no berth is available, then laytime cannot commence until six hours after tender of a notice of readiness. No such notice can be given unless the vessel is "ready to load". If the vessel arrives and a berth is available so that she can be made "all fast", then according to libelant laytime commences even though the vessel is *not* "ready to load". Such a radical difference cannot sensibly be made to depend on the happenstance of a berth being available or not.

It should be noted that the charter in suit requires that a notice of readiness be given; there is no option as to this. Whether any notice of readiness was given here is doubtful because the only such notice was addressed by the Master of the Peace to Aramco and not to the charterer. In any event, no effective notice of readiness could be given because the Peace was not in fact "ready to load". The leading case in this area is Aktieselskabet Fido v. Lloyd Braziliero, 283 F. 62 (2d Cir. 1922) where it was said (at 69):

"A notice of readiness when a vessel is not actually ready has no effect. A notice is without legal effect, if the facts it states are untrue."

It is laid down in Carver, Carriage of Goods by Sea (10th ed.), 861–62, as follows:

"Before the lay days at the port of loading can begin to run against the charterer, he must have had notice of the ship's arrival, and of her readiness to receive cargo.

\*　　\*　　\*　　\*　　\*　　\*

"And such notice cannot be given until the ship is an 'arrived' ship, i. e., has arrived at the stipulated place, and is, so far as she is concerned, ready to load.

"*Quarantine*—Where the ship is not herself in readiness to receive or discharge cargo, but has been directly disqualified from loading, or unloading, as by quarantine regulations of the port or for reasons of state, it has been held that the shipowner cannot claim for the consequent delay."

An English case and a Scottish case are sufficiently close on their facts, and sufficiently interesting, to warrant attention.

The Austin Friars, 71 L.T. 27 (1894) is a decision of the President of the Probate, Divorce and Admiralty Division. The charterers had the option to cancel "if the ship does not arrive at port of loading and be ready to load on or before midnight of 10th Oct." The ship arrived at the loading port at 11 p. m. (2300) on October 10, "but no one could leave the ship or come on board until the doctor had visited her and pronounced her free from infection". The doctor came on board next morning (October 11); the ship was given medical clearance but the charterers cancelled the charter for failure to be ready to load by midnight, October 10. The registrar had held that the ship was ready to load on arrival at 11 p. m. on October 10. This was specifically disapproved, the President stating:

"If the ship is not in fact ready to load by the specified time, they [the charterers] are to be entitled to cancel the charter party."

The President further stated that "a quarantine regulation constitutes a disqualification of the ship to load" and that there is "no distinction for this purpose between a medical officer in authority ordering a ship into quarantine, and his prohibiting access to her until he can examine into her condition".

White v. The Steamship "Winchester" Co., 23 Scottish Law Reporter 342 (1886) is a decision of the Court of Session of Scotland. There a ship while at Port Said in Egypt was chartered to load ore at a Turkish port. On arrival at the loading port, the ship was ordered into 21 days quarantine enforced by Turkey against all ships coming from any port in Egypt. It appeared that neither party to the charter knew of such quarantine regulation at the time of chartering. The court held that the lay days did not commence to run until *after* the period of quarantine. Lord Shand said (at 347):

"When do the lay-days begin to run? Is it enough that the vessel shall sail to the appointed place of loading even where, as in this case, she is disqualified from receiving cargo—where pratique cannot be obtained by the captain. * * * It humbly appears to me that the weight of sound reasoning is against that view, and that until the vessel is not only at the place of loading, but the captain or owners are in a position to place her at the disposal of the charterers as open to receive cargo, she cannot be regarded as an arrived ship within the meaning of the contract, and consequently that until she can be so presented the lay-days cannot commence to run against the charterer, even where he has undertaken to complete the loading within a specified time. * * * It cannot make any real difference that the vessel was in fact allowed to sail up to the intended place of loading, for she was immediately ordered to leave Macri * * * and it can, I think, make no difference that she did reach Macri to the effect of reporting herself, the result being that she was immediately ordered to leave as a suspect ship."

Laytime by definition is the time allowed for the charterer to load or unload. Its length is calculated as that within which loading or discharging can take place at a reasonable rate. It is therefore a contradiction in terms to say that laytime can commence before the vessel is "ready to load".

The quoted provision from the charter party starts off by requiring a "notice of readiness" when the vessel has arrived "and is *ready to load* or discharge" (emphasis supplied). It seems tolerably clear that the requirement of "ready to load" applies to the whole of paragraph 6, including the case where a vessel goes directly to a berth without waiting in the stream. The provision contemplates two situations: (a) where no berth is available and the vessel must anchor in the stream and (b) where a

berth is available on arrival and the vessel goes directly to it. In the second case, laytime can commence immediately because the charterer can begin loading; but of course this presupposes that the vessel is "ready to load". In this connection, it should be noted that paragraph 7 of the charter provides, among other things, that the "running hours * * * specified as laytime * * * shall be permitted the charterer for loading, discharging and used laytime".

Libelant relies strongly on Cantiere Navale Triestina v. Handelsvert, Retung Der Russe etc, Naphtha Export, 16 Aspinall's Maritime Law Cases 501 (Court of Appeal, 1925). This decision was in a case where loading was delayed for a substantial period solely by reason of action by the local port authorities. It could be no precedent here, however, because the delay took place *after* the vessel was "ready to load." This was specifically pointed out in the opinion of the Master of the Rolls who referred to the umpire as having "held the vessel was a ready ship at 8 a. m. on that day" and stated that "we are bound by that finding" (page 508).

The Nizeti, [1960] 1 Lloyd's Rep. 132 (Court of Appeal, 1959) is likewise distinguishable. It involved a claim for damages by the charterer against the shipowner. The Nizeti was chartered to carry wheat from a Syrian port to North Africa. She arrived at port on May 28 and was refused free pratique because of an earlier call at an Israeli port. It appeared, however, that the vessel since that time had made four trips through the Suez Canal which were permitted because the master signed agreements of future "non-cooperation" with Israel. It also appeared that the Syrian authorities could permit loading if a "non-cooperation" agreement were made. Before such permission could be obtained and on June 3, Syria imposed a total embargo on export of wheat to North Africa. The Nizeti sailed away on June 5 without cargo. The charterer had not cancelled although the "cancelling date" had passed. It was held that the embargo was the cause of failure to load and not the refusal of free pratique, to obtain which a reasonable time was allowable to the vessel. It was held that this reasonable time had not expired by June 3 and that the owner accordingly was not in breach of the charter party when the total embargo was imposed. The Court of Appeal said (at page 137):

"A short measure of delay may be involved in the situation where a master had to make a declaration of non-co-operation before being allowed to load, but it is not true to say that the voyage was foredoomed to failure. It would be otherwise if the delay involved up to the time the vessel became an arrived ship were so great as to defeat the commercial purpose of the voyage."

If the case at bar involved a claim by the Government against the vessel for failure to carry the cargo, The Nizati might be indicative of the vessel's obligations. But there is no such claim here; on the contrary, the issue is solely the right to cancel. Moreover, it took some six months before the National Peace could be taken off the blacklist. This would certainly be sufficient "to defeat the commercial purpose of the voyage", even under The Nizati test.

A case much closer to that at bar is Puerto Madrin S.A. v. Esso Standard Oil Co., 1962 A.M.C. 147 (S.D.N.Y.1961), cited by libelant. The charter provision for commencement of laytime was exactly the same as here. The vessel gave a "notice of readiness" when 75 miles from port. This was held ineffective because (a) the vessel had not arrived at port and (b) the vessel "was unable to discharge because of the condition of its boilers". The vessel berthed at a dock. Without discussion and apparently in agreement with both sides, Judge Herlands stated that laytime commenced when the vessel was "fast in berth" although there was elsewhere a finding that she was "unable to discharge". With great respect and deference, the statement about commencement of laytime seems in error; apparently the point was

**638**

not argued to Judge Herlands and his statement was made without direct attention to it.

 Libelant contends that the Navy was obliged to nominate a "safe port" and that "safe" means politically safe as well as physically safe. There is some authority for the general proposition. Carver, above cited, 668–69; Scrutton on Charterparties (16th ed.) 127; Poor on Charter Parties (3d ed.) 62. The danger to the ship apprehended in a port which is politically "unsafe" seems to be something like seizure or "certain risk of confiscation". Ogden v. Graham, (1861) 31 L.J.Q.B. 26. In the circumstances here "safe port" should not be given the meaning "without risk of loading interference from the Arab boycott". The parties never considered such a meaning; the Navy knew nothing about the Memory I voyage to Israel, and certainly was not put on any notice by the entry in the Houston Custom House. The word "safe" was not part of the provisions to which the Navy agreed at the time the charter was fixed. It was added by libelant's broker and ought not to be given such effect as to shift the risk from the owner to the charterer. Other portions of the charter, such as paragraph 8, indicate that the word "safe" is used in the sense of physically safe. Moreover, with full knowledge of all the facts, including facts as to the Israel voyage not known to the Navy, libelant and the master accepted the nomination of Ras Tanura and proceeded there without protest. "When a charter names a port and the master proceeds there without protest, the owner accepts the port as a safe port, and is bound to the conditions that exist there." Poor, above cited, page 63. See also The Maggie Moore, 8 F. 620 (C.C.Md.1881); Tweedie Trading Co. v. New York & Boston Dyewood Co., 127 F. 278 (2d Cir. 1903); The Breynton, 1934 A.M.C. 1473, 1476 (arbitration at New York, 1933).

 The failure of the Navy to name another port after loading could not be accomplished at Ras Tanura is not a basis for criticism much less for legal consequences. There was no obligation on the Navy to name another port and the delicacy of the situation at Bahrain, its other port of supply in the Persian Gulf, made its caution understandable.

The foregoing includes the findings of fact and conclusions of law required by Rule 46½ of the Supreme Court Admiralty Rules.

The decree must be for respondent in No. 196–272 and for libelant in No. 199–144.

Settle decree or decrees on notice.